VAUGHN & Mc-
KEE'S HEIRS
vs
HANN.

---

CHANCERY.

*Case* 70.

# Vaughn and McKee's Heirs *vs* Hann.

APPEAL FROM THE FAYETTE CIRCUIT.

*Rescission of contracts. Fraud.*

*April* 11.

The case stated.

CHIEF JUSTICE EWING delivered the opinion of the Court.

IN 1828, on the petition of Jane and Wm. McKee, infants, by their father and natural guardian, Darius McKee, all their interest in remainder in a tract of land, lying on the north side of the road leading from Lancaster to Danville, derived by descent from their mother, who claimed under the will of Henry Pauling, deceased, was decreed to be sold, subject to their father's life estate, as tenant by the courtesy, as necessary for their maintenance and support, and the same was sold according to the directions of the decree, by Jesse Yantis, a Commissioner appointed by the Court, and John Hann, is reported to have been the purchaser, at an aggregate sum, which is equivalent to $5 12½ per acre, for 213½ acres, the estimated quantity, at which rate per acre it was sold, three good and competent Commissioners, appointed by the Court, having previously valued their interest only at $5 per acre. John Hann afterwards purchased from Lapsley, who had previously acquired the

same, the life estate of Darius McKee, and having paid the consideration for the remainder, (the same having been sold on a credit,) died, having previously devised the land to his wife, Jane Hann.

Upon the motion of Jane Hann, the Court being satisfied that the consideration had been paid, a conveyance was made to her by a Commissioner appointed for that purpose. Mrs. Hann, by executory contract, afterwards, in 1839, sold the land to Vaughn, upon a credit, at $37½ per acre, estimating the quantity at 200 acres, more or less, and received Vaughn's two bonds for the price, executing her bond to him for a conveyance, by general warranty, upon the payment of the last instalment.

In 1841, Vaughn exhibited his bill, charging irregularity in the proceedings, under which the sale of the infants remainder was made, and inability on the part of Mrs. Hann to convey by good title, &c. &c. While this case was pending, a writ of error was sued out by the infants, to reverse the decree for a sale, obtained under the petition aforesaid. That decree was affirmed by this Court, upon a full hearing, as to the land in question, as will be seen by a report of the case, (9 *Dana*, 526.)

Vaughn's bill progressed, and the contract of sale by Mrs. Hann to him, being annulled by the Circuit Court, she brought the case to this Court, and the decree of the Circuit Court was reversed, and the cause remanded, with directions to dismiss the bill. After the return of the case, and execution of the mandate, by dismissing the bill, this bill in the nature of a bill of review was exhibited in the Circuit Court by Vaughn against Mrs. Hann, charging that about fifteen acres of the land sold to him, which embraced nearly all the timber upon the tract, was not embraced within the patent boundary of Henry Pauling, under whom Mrs. Hann derived title, and that this matter had been discovered after the case upon the former bill, had been decided by this Court. Various amendments were subsequently made repeating the charge, and also charging fraud in the sale under the petition aforesaid, and that McKee's children had instituted an ejectment against him for the land, and by a subsequent amendment he made them parties, who ap-

VAUGHN & Mc-
KEE'S HEIRS
vs
HANN.

peared and exhibited their cross bill against Mrs. Hann and Vaughn, charging fraud in Lapsley and Hann, in the sale and purchase under the decree rendered on the petition aforesaid. Mrs. Hann answered all the bills and amendments, controverting and denying substantially, all the charges made. Upon the hearing in the Fayette Circuit Court, to which Court the cause had been removed by the consent and arrangement of the parties, with a view to expedite the final determination of the controversy in this Court, the Circuit Judge, without examination of the record, dissolved Vaughn's injunction and dismissed his bill and the cross bill of the McKees, and they and Vaughn have brought the case to this Court.

The discovery of
evidence exist-
ing only in parol,
to points in issue
in an original
bill, is not good
ground to sus-
tain a bill of re-
view.

This Court cannot notice any supposed errors or irregularities in the proceedings or decree, under which the land in question was sold, on the petition of the father and natural guardian of the infant McKees, arising upon the face of the record, nor any irregularities in the sale made under the same, as those questions have been tried before and settled by this Court. And it is a matter of some question whether the Court should investigate or notice the defect of title charged by Vaughn, or the inability of Mrs. Hann to convey, as to any part of the land sold, as the allegations made and issues joined on Vaughn's former bill, were broad enough to admit proof as to a defect of title as to all or any part of the land sold, and the general rule is that the discovery of new *evidence in parol*, which was in issue, or might have been proven in a former suit, is not a good ground for a bill of review, or re-investigation of the same subject matter of controversy. That there may be an end to litigation, vigilence is required of litigants to understand their cases, and to search out and produce *all* the evidence that can be produced in support of the issue made, and they will not be indulged in a second hearing, upon the same matters involved in a former suit, or which might have been investigated, upon the discovery merely of new proofs in parol. But waiving this objection and indulging Vaughn's bill in the case before us, on the ground of the discovery of *new matter*, in relation to the boundary of Pauling's pre-emption patent, under which Mrs. Hann claims, by

which some fifteen acres of land sold is charged to be excluded, two questions only can be raised upon this record or noticed by this Court :.

I. The fraud charged in the decretal order and sale under the petition, extraneous the record.

II. Is the fifteen acres out side of the western boundary of Pauling's patent?

1st. As to the fraud charged, it is attempted to be sustained mainly by the proof of the declarations and confessions of John Lapsley, made before, about the time of, and shortly after the sale, who it is charged and attempted to be proven, was the purchaser of the remainder at the sale, and who was the owner of the life estate of Darius McKee.

We have examined with scrupulous care and attention, the proofs adduced, as well in relation to the *matter* as *manner* of the detail, and looked into the proofs as to the character of the witnesses, their standing and condition in life, and opportunities of hearing and recollecting the confessions of Lapsley, and without stopping to comment on the same in detail, we would remark: 1st, that some of the witnesses by whom the confessions are proven, are of bad, and others of doubtful character, and nearly all are obscure citizens, who, from their condition, would not be likely to have much if any intercourse with Lapsley and Hann, and would be little likely to understand, recollect, or detail with accuracy and precission, any statement made by Lapsley some sixteen years before, about a matter in which they could have no interest nor feel any concern.

The evidence of confessions at best, is the weakest and least to be relied on, of any known to be competent in law, because, as has often been said, the confessions are easily misunderstood, mis-recollected, perverted, or misrepresented through design or mistake, immediately after the confession is heard, and when the whole statement is fresh in the recollection of the witnesses, and it is almost incredible that witnesses would be able to treasure up and detail with reliable accuracy, casual and loose statements made about sixteen years before, about a matter

Evidence of confessions are the weakest and the least to be relied on of any evidence known to be competent in law.

in which they could have no interest nor the least con-
cern or inducement to recollect.

2dly. The confessions are proven to have been made
in the presence of no respectable man who is living, but
in the general, in conversations with men who are dead,
and who consequently, cannot be brought forward to con-
tradict the evidence or explain the confession, if any was
ever made.

3dly. The confessions proven as to the purpose and
object of Lapsley, are contradictory with each other,
some of them tending to establish that he purchased for
the benefit of Hann, others that he purchased for the ben-
efit of the infants and as a means of securing the land to
them, against the wastefulness of their prodigal father,
which latter purpose is ridiculously absurd and not to be
believed, as their interest was as secure and beyond the
reach of their father or his creditors, before as after the
sale. A very slight change in the version of the pretended
confession, if any was made, might change the whole char-
acter of the admission. If the statement was that the sale
was made on *account* of, and for the *benefit* of the children,
meaning their support and maintenance, the confession
was strictly true, and yet may have been understood by
those not understanding the nature of the interest, that
the land was purchased for the benefit of the children and
for their use.

4thly. It is scarcely to be credited, that a man of
Lapsley's intelligence and standing in the church, would
so often make confessions of his own fraud, on the rights
of helpless infants to whom he and his wife were greatly
attached, who were much of their time inmates of his
house, and to whose necessary support, both he and his
wife had contributed liberally; and the more incredible
is it, that none of his intimate friends and associates, who
understood the whole matter, ever heard such statements
or confessions.

5thly. The proof of confessions is precisely that char-
acter of testimony which bad men may persuade or sub-
orn witnesses to give, and bad men may, and do often
give with impunity. And unusual and unjustifiable, and
to say the least, unworthy efforts have been made to drum

up witnesses, among loose and doubtful characters, and take their depositions without cross examination, committing them before hand, to the confessions which they would prove, if not prompting them to the proof. And the fact appears that one of the witnesses whose deposition is produced, purporting to be duly taken, proving fully the fraud by the confessions of Lapsley, denied afterwards, that he had ever given a deposition in the case, or *knew* Lapsley, or ever heard him make any statement about the land, and if he did he was drunk; and afterwards gave his deposition at the instance of Mrs. Hann, to the same effect. And two others of the witnesses, whose *ex parte* depositions were taken, going fully up to the desired proof of Lapsley's confessions, and given with a *precission, deliberation,* and *detail,* which argues strongly that they were prepared to hand, upon cross examination, at a subsequent short time, were unable to repeat the confessions of Lapsley, or the statements which they had made in their former depositions, in relation thereto. These and other facts evidencing unfairness, are calculated to cast a dark shade over the whole proof of confessions, and to render it doubtful whether, upon such proof, at this distant day, a decree dissolving the contract of sale for fraud, ought to be rendered, independent of the countervailing proof.

The same objection lies also to the most of the proof that Lapsley was the purchaser. And in addition, it may be further remarked, that to those to whom it was known that Lapsley was the owner of the life estate, the impression of course would rest on their minds, that it would suit him best, and he might afford to give more, and therefore would buy the remainder; and the impression that he had purchased, may have been thus honestly originated and left on their minds. And with others, and especially those who did not understand the character of the two estates, they might have understood the declarations of Lapsley, that he had purchased the life estate, as an acknowledgment that he had purchased the remainder, or with a slight change in the version at this distant day, they might easily convert the acknowledgment of an intention to buy, or that he had bought the land from

McKee, having reference to the life estate, into an ac-, knowledgment that he had bought the remainder. Against this uncertain, suspicious and doubtful evidence is, 1st. The deposition of Lapsley himself, (who must know whether he purchased or not,) that he did not purchase the remainder. That he made the first bid, bidding the price at which the Commissioners valued the estate, and Hann the second, to whom the estate was stricken off, and that all was fair, open and unaffected with fraud or disguise, as far as he knew or believed. 2d. Mrs. McKee proves, that immediately after the sale, Lapsley complained of Hann for over bidding him, as he was the owner of the life estate, and had bid the full value of the remainder. 3dly. Some three or four months after the sale, an angry controversy sprung up between Hann and Lapsley, in which the former filed his bill against the latter, enjoining and restraining him, as the life tenant, from committing waste and destruction of the timber, which he was charged with doing, and after this bill was filed, Lapsley sold the life estate to Hann, by the consent of Darius McKee, to whom Lapsley had before agreed to re-sell upon specific terms, and the bill was dismissed. Had Lapsley purchased the remainder, it can hardly be believed that he would have sold the same to Hann, without selling the entire estate, which must have commanded a better price, and especially as he was on the eve of removing to Danville to keep a boarding house, and consequently had no use for the life estate in the land, as a place of residence; nor can it be believed that Hann would have taken Lapsley's bid, or purchased the remainder from him, without purchasing the whole estate. At least such a mode of purchase is strangely unusual in this country. 4thly. The report of the Commissioner, who is of undoubted character for competency and fidelity as an officer and as a man, shows that Hann was the purchaser, and his bonds with security for the considera. tion, are exhibited with the report. 5thly. It seems to have been generally understood among the immediate friends and relations of Lapsley and Hann, that the latter was the purchaser.

Against the allegation and proof of fraud in Lapsley or Hann, are 1st, the facts which are undoubted, that it was *necessary* and *proper* to sell the remainder for the support and education of the infants, and the price which it commanded was more than it was valued at by Commissioners selected by the Court, of undoubted integrity, intelligence and qualification; and the price paid on it was, under all the circumstances then appearing, as high as it should have been valued at, according to any known rule of computation, and as much as any other would have given for such a remote contingent interest, which no one could expect to enjoy during his life. If, therefore, a fraud was perpetrated, it was a fraud without injury.

The necessitous condition of the infants demanded the sale. They were without means of support or of education, and thrown upon the charity of others for both. The sale of a remainder was authorized by the statute, and it was better that it should be sold, though on account of its contingent character, it might not command a good price, and the proceeds applied to the decent support and education of the infants, than that they should be raised by an intemperate father, in idleness, ignorance, and dissipation, or thrown upon the cold charity of the world, without means of support or moral culture, and exposed to the temptations incident to their condition. It was better for them to be *well raised,* without property at their maturity, than to be *badly* raised with unbounded means at command when they arrived at age.

The wild lands in which they had a contingent interest, in part was incumbered by adversary claims, and if sold under the hammer, it is obvious if any of them would have commanded any price, it would not have exceeded a mere nominal amount, which would have availed nothing, in the support and education of the children.

Darius McKee, at whose death the interest purchased would come to the possession of the tenant in remainder, was a young man of stout and healthful constitution, and had before become temperate in his habits, and joined the Presbyterian church, though he afterwards returned to his previous dissipated habits. In view of his age,

health, and habits at that time, it might have been estimated that he would live some thirty or forty years. Estimating his future life at twenty four years, the sum laid out for the purchase, if loaned out at legal interest, and that annually compounded, would equal twenty dollars and fifty cents for each acre paid for; and if he should live thirty six years, the amount made by loaning out the fund, would amount to about forty one dollars, which sums, at the expiration of either period, would, it may be presumed, from the present estimated value of the land, equal, if not exceed the entire fee simple value of the land per acre, and especially under the negligent culture of the most of life tenants. And if the rent derived from the life estate be estimated at $300 per year, which is the lowest rent proven, in thirty years it would amount to upwards of $9,000, which no doubt would greatly exceed the entire fee simple value of the land; which shows that the value of the life estate, in an improved place, may greatly exceed that of the remainder, and money may be often much more profitably invested in the life estate, than in a remainder dependent upon the life of a stout, healthy young person.

2d. The decretal order directed the remainder in all the land lying on the North side of the road leading from Lancaster to Danville to be sold, and the Commissioner reports that the sale was made according to the directions of the decree, which implies that every thing was done as to the advertisements, and in other respects, which the decree directed, the Commissioner being a man and officer of acknowledged skill and integrity. And the bonds of Hann exhibited with the report, show an aggregate amount which, at $5 12½ per acre, would require the sale of precisely 213½ acres to produce. This shows that the quantity was ascertained by survey before the sale, or at least before the report, and Yantis, the Commissioner, proves that the quantity was ascertained by survey before the sale.

But if the quantity was not ascertained before the sale, the advertisement produced shows that the quantity was estimated at between 150 and 200 acres, and is so stated in the notice, and if it be true that the quantity was

not ascertained by survey before the sale, as the quantity indicated in the notice to the public, and no doubt proclaimed on the day of sale, was so near the true quantity, and the sale was by the acre, we cannot believe that any deleterious effects on the sale was produced by not ascertaining the precise quantity before the sale.

Nor can we believe that any person who desired to purchase, could have been or was misled by the casual omission in the single advertisement produced, of the precise place at which the sale was to be made, even if such omission was made in the other advertisements, which were directed by the decree, which does not appear. The place to be sold was clearly described, and was well known, "lying one mile from Lancaster, on which Lapsley lived," &c., and the interest in it was clearly indicated. Had any one seeing the advertisement, desired to purchase, he would, from the language of the advertisement, have been certainly brought to the conclusion that the sale would be made either on the premises or at Lancaster, and most likely at the former place. And if he was left in doubt, he might have attended at both places on the same day, and made inquiry of Yantis himself where the sale would be made. Besides, loud proclamation was made in the streets of Lancaster, by Yantis, on the day of sale, that he was then going out to the premises to make sale of the land, under the decree. If any person was in town waiting an opportunity to buy, the presumption is, that he would have heard the proclamation, and if on the premises, he would have been at the place where the land was sold, ready to bid.

Upon the whole, without referring to other corroborating proofs, in favor of the validity of the sale, we are satisfied, if Lapsley was the purchaser, and was now the holder of the estate, that there is no sufficient ground to annul the sale on the score of fraud. But if Hann was the purchaser, as the best bidder, and not Lapsley, then there is no plausible pretext for the dissolution of the sale, as there is no plausible evidence of fraud, concealment, misrepresentation, or other misconduct, in procuring the sale, or affecting the purchase, unless it was that he was a rival bidder against Lapsley, and made the

estate command 12½ cents per acre more than it would otherwise have commanded, and more than it was valued at by intelligent and disinterested Commissioners.

Tho' a purchaser at Commissioner's sale may act fraudulently in his purchase, yet a purchaser from him, not participating in the fraud or having knowledge of it, will be protected.

But if Lapsley was the buyer, and the fraud was made out against him, there being no sufficient evidence of combination or fraud against Hann, nor participation in Lapsley's fraud, and he having paid the consideration, and the deed having been executed to Mrs. Hann, his devisee, without notice to either of Lapsley's misconduct, her title cannot be affected. She has law and equity upon her side, and cannot be ousted by a latent equity, resting upon extraneous facts, made out by parol proof, and of which she and her husband had no notice. Without pursuing this branch of the subject further, we are satisfied that there is no sufficient ground to annul the sale of the remainder.

II. We have had more difficulty with the second question stated, or the question in relation to the boundary.

There are two corners found, each claimed by the parties as the true S. W. corner of Pauling's pre-emption survey of 1,000 acres. The one claimed by Vaughn, stands nearly due east, about forty poles from the corner claimed by Mrs. Hann as the true corner. And by running from the N. E. corner, a black oak stump, acknowledged by both parties to be a true corner, to the corner claimed by Vaughn, about 15 acres of timbered land sold by Mrs. Hann to him, will be left out of Pauling's pre-emption patent, under which she claims title. By running from the same corner, black oak stump, to the corner claimed by Mrs. Hann, the whole quantity sold will be embraced in the patent. The evidence and circumstances adduced to establish each of the corners, are contradictory, irreconcilable, and greatly perplexing. The patent calls for "a hickory and dogwood, near a branch that runs into Dick's river, thence crossing said branch East," &c.; a hickory is found at both corners, marked with old marks as corners to the survey, and a dogwood stump is found near the hickory claimed by Vaughn as the corner, an unmarked dogwood is found at no great distance from the hickory claimed by Mrs. Hann. There are old line marks found on both lines, running from the

black oak stump to each of the hickories. There is a branch running into Dick's river, which will be crossed by the next line which runs east from each of the corners, about twelve poles from the corner claimed by Vaughn, and about fifty poles from the corner claimed by Mrs. Hann, and there is another branch very near the corner claimed by the latter, which runs into another which empties into Dick's river; but this branch is not crossed by the next line. The corner claimed by Vaughn certainly suits better the discription, "near a branch," &c. than the corner claimed by Mrs. Hann. But neither of the corners stand *very near* the branch claimed as the branch called for, nor do either of them stand *very far* from it, and there is no defined distance given from the corner to the branch. The word *near* is an indefinite term, and is expressive of no precise distance, and may have been inaccurately used by the surveyor in making out his certificate of survey, from field notes previously taken in running the survey, the reverse of the courses given in the certificate, or perhaps in running it in part only, and may have been used, in reference to either corner, in comparison to the whole length of the line, or the distance of the next corner from the branch, if the branch in question be the one referred to.

If the variation found by Doty, in running the line from the beginning of the survey to the black oak stump, (two admitted corners,) be adopted in running the line from the same stump southwardly, at the end of the distance, a point would be run to, at neither of the corners in contest, and not far from midway between them, as the course to be run would be south two and a half east, instead of south three and three-fourths east, the course run to reach the corner claimed by Vaughn.

It is stated in the original certificate of survey of Pauling's pre-emption, made in 1784, that the variation of the needle at that time was three degrees east. From the black oak stump to strike the corner claimed by Vaughn, according to the report of Doty, a variation west of three and three-fourth degrees being required, the declension of the needle, within the last sixty years, would be six and three-fourth degrees west, which would be

greater, we think, than it has been within that period. According to McKee's deposition, who is, as well as Doty, a practical surveyor, by running from the black oak stump, according to the magnetic meredian south, a point would be struck some nine or ten poles east of the corner claimed by Mrs. Hann, and by running from the same stump south one degree nineteen seconds west, the corner claimed by her would be arrived at, which shows one degree and forty one seconds less variation east, at this time, than it was when the original survey was made. It may be that the west boundary line was run originally by mistake, according to the magnetic meredian, or south three degrees west, that being the variation east at that time, and the other lines were run by the true meredian. According to this supposition, the declension of the needle west, since that time, according to McKee's experimental survey, would be about one degree nineteen seconds west, and by other surveyors, a little upwards of two degrees. And by allowing for this variation or declension of the needle to the west, upon the supposition that the magnetic meredian was adopted originally, the corner claimed by Mrs. Hann will be about reached. And by allowing that the true meredian was adopted in running the other lines, allowing the same variation upon those lines that has been adopted by Vaughn's surveyors, the same corners will be reached, and that confusion and confliction between Pauling's patent and the adjoining claim be avoided, as the corner claimed by Mrs. Hann, is about due west from the corner claimed by Vaughn. Be these suppositions as they may, it is certain that a mistake was made in the course, in running the west boundary line, or in running the line from the beginning to the black oak stump, as the variation found on the last mentioned line will not strike either of the corners claimed by the parties.

A mistake found
in running one
line of a survey,
does not author-
ize the conclu-
sion that mis-
takes were made
in the other lines
of the survey.

And it is known to the Court, that many inaccuracies and mistakes are found in surveys executed at so early a day as that of Pauling's. And the fact that a mistake in course or distance is made in one line, is certainly no evidence that a similar mistake is made in others. Hence if one variation or departure from the magnetic or true

meredian becomes necessary to run to one corner, it is no evidence that the same must be made to run to others.

Again, more than half a century ago, and a short time after the original survey was made, there was a long and angry controversy between Pauling and Meriweather's heirs, on a caveat filed by the former against the latter, who claimed nearly the same land covered by Pauling's pre-emption, under an adversary pre-emption of 1,000 acre survey. In this controversy several surveys and connections were made and reported to the Court by different surveyors. In all of these surveys it appears that the western boundary line is laid down as crossing the branch, now called Gill's branch, below the junction of the forks. The line running to the corner claimed by Mrs. Hann, crosses the branch just below the junction of the forks, and that running to the corner claimed by Vaughn, crosses the branch just above the junction of the forks. When the objects and marks upon the ground were fresh, and witnesses living by whom they could be established, it is to be presumed that the true line was then found and laid down.

Again, there is parol testimony proving that Pauling, some thirty years ago, recognized the corner claimed by Vaughn as his true corner, and the line running to it as his western boundary. On the other hand there is, as we think, a preponderance of evidence that he always recognized the corner, and line running to it, claimed by Mrs. Hann, as his true corner and western boundary, and remained in possession till his death, claiming up to that line. And Meriweather's heirs, who lost the land embraced in Pauling's patent boundary, but holding a part of their pre-emption adjoining and up to Pauling's western boundary, and who were interested, being entitled to all the land between the two lines, if Pauling's western boundary was the line claimed by Vaughn, certainly recognized the line claimed by Mrs. Hann as early as 1810, if not sooner, by written evidence which is not subject to the mistakes or mis-recollections of witnesses. In 1810 they sold and conveyed to Sasseen a part of their land lying adjoining the western boundary of Pauling's survey, and in the same year

sold and conveyed to Brand another parcel adjoining the same boundary, and in both these deeds they call for and run upon the line claimed by Mrs. Hann, as the western boundary of Pauling's pre-emption of 1,000 acres. And at different times there have been sub-purchasers from Sasseen, and they all, up to the present time, and now claim, the line claimed by Mrs. Hann, as Pauling's true western boundary, and claim no further. Indeed, there is no claimant for the land between the lines, if Pauling's patent does not embrace it. Meriweather's heirs have disclaimed it by deeding all their lands to Sasseen and Brand, up to Pauling's western boundary. The purchasers and sub-purchasers from them, have always and still disclaim all interest in it, or title beyond the line claimed by Mrs. Hann, which has ever been recognized and claimed by them all as the true western boundary of Pauling's pre-emption. All parties interested in the land, on both sides of the line, have, for near forty years, recognized and claimed up to the line on each side, contended for by Mrs. Hann.

Under all the circumstances, the quiet of titles and security of purchasers demand, that a line thus recognized and admitted as the true line, should be established and treated as the true line, or at least should not be unsettled and changed by any thing less than the most satisfactory and conclusive evidence in favor of another line being the true one, and of fraud or mistake in the recognition of the line as the true one, if even such evidence should be regarded after so great a lapse of time.

Upon the whole, we are satisfied that there is no ground for the rescission of the contract of sale made by Mrs. Hann to Vaughn.

The decree of the Circuit Court dismissing the bill of Vaughn, and cross bill of McKee's heirs is, therefore, affirmed, with damages upon the damages awarded below, and costs.

*Clay, Bradley and Goodloe* for appellants: *Robertson, Robinson & Johnson and Letcher & Tilford* for appellee.