Ketchum vs. Breed.

KETCHUM, Appellant, vs. BREED, Respondent.

*December 7, 1885 — May 15, 1886.*

NEW TRIAL: EQUITY: BILL OF REVIEW. *(1) Absence of party and witness from trial: Laches. (2) Discretion. (3, 4) Newly discovered evidence.*

1. Supposing that a continuance would be granted, a defendant was absent with a material witness when the cause was called, and the issue was decided against him. He however reached the place of trial with said witness on the same day, while the plaintiff's attorney and witnesses were still present, but made no effort then to have the cause reopened on the ground of his failure to be there with the witness. *Held,* that the failure to make such effort at that time was such a want of diligence as to bar any subsequent application on the same ground.

2. The granting of relief by bill of review rests in the sound discretion of the court.

3. Where newly discovered evidence would have been relevant and material to the former issue, and rests wholly in the memory of witnesses living at the time of the hearing, whose testimony might then have been obtained had their knowledge of the facts been then known to the parties, it will not be available upon bill of review where it is merely in contradiction of evidence that was given, or merely cumulative to evidence which was, or with ordinary diligence might have been, given upon such hearing.

4. "New proof" to be available upon bill of review must be such as could not have been discovered before the hearing by the exercise of reasonable diligence.

APPEAL from the Circuit Court for *Winnebago* County.

The following statement of the case was prepared by Mr. Justice CASSODAY:

This is an appeal from an order sustaining a demurrer to a bill of review, on the grounds of insufficiency and defect of parties. The following facts appear, in effect, from the bill, and some of them from the records of this court in the same litigation. *Breed v. Ketchum,* 51 Wis. 164; *Ketchum v. Breed,* 54 Wis. 131.

February 21, 1875, Horace H. Rich, John W. Stillman, and Martin Rich executed and delivered to *Breed* their promissory note for $5,000, payable two years from that date, with interest at ten per cent., payable semi-annually, and, to secure it, at the same time executed and delivered to *Breed* a mortgage upon the lands described and known as the "Omro Mill." Upon the maturity of the note, an action was commenced against the makers and G. M. Wakefield and said *Henry Ketchum* and his wife to foreclose the same; and the complaint of foreclosure, among other things, alleged, in effect, that March 22, 1876, the said mortgagors bargained and sold said mortgaged premises to said G. M. Wakefield, who, as a part of the purchase money thereof, undertook and promised to assume and pay said mortgage, and the whole thereof; that afterwards said Wakefield sold said premises to said *Henry Ketchum*, who, as a parcel of the purchase money, undertook to assume and pay said mortgage. The usual judgment of foreclosure and sale was demanded, and also "that the defendants Horace H. Rich, John W. Stillman, Martin Rich, G. M. Wakefield, and *Henry Ketchum*, who are personally liable, may be adjudged to pay any deficiency which may remain after the application of all money so applicable thereto." *Henry Ketchum* demurred to the complaint, and the demurrer was held frivolous, and judgment of foreclosure and sale was entered in the action, October 29, 1877, adjudging, among other things, that Wakefield and *Henry Ketchum*, as well as the makers of said note, were liable for the payment of any deficiency that might arise on the sale.

January, 1879, the mortgaged premises were sold under the judgment, and the sale was confirmed February 18, 1879. There was a large deficiency on the sale. After the sale, but before confirmation, *Henry Ketchum* moved the court to vacate the judgment against him personally. The motion was denied, except so far as to permit him to an-

swer. *Henry Ketchum* then answered, and admitted most of the allegations of the complaint, but, in effect, expressly denied that in his purchase of the premises from Wakefield, and as a part of the purchase money, he undertook to assume and pay said mortgage or any part thereof; or that he in any manner obligated himself or agreed to pay any portion of said mortgage in any manner whatever; or that he was personally liable for any portion of said mortgage debt; and alleged that he was not then and never had been in the possession and enjoyment of the premises, or any part thereof; and that he had never received any rents or profits of said premises, or any part thereof.

The cause being thus at issue, was on the calendar for trial at Oshkosh, January 19, 1880, when the said *Henry Ketchum* signed and swore to an affidavit for a continuance by reason of the absence from the state of one John Fortune, a material witness; and which affidavit, he was informed by his counsel, was sufficient for a continuance, and, relying thereon, he went 150 miles from Oshkosh, the place of trial. February 11, 1880, the attorney for said *Ketchum* applied for a continuance of said cause upon said affidavit and his own, which was denied, and the fact telegraphed to said *Ketchum* on the same day. *Ketchum* and one of his witnesses, A. S. Trow, immediately started for Oshkosh, and reached there February 12, 1880, at 2 P. M. He had been informed by his attorney, and believed and relied upon it, that, if he failed to procure a continuance for the term, he could, under the rule then in force, procure a continuance for the day and from day to day on terms. Said attorney applied for such day continuance February 12, 1880, but the same was denied in consequence of the former suspension of such rule, and when *Ketchum* and his said witness reached Oshkosh the trial had been had, and said issue had already been decided against him.

Upon the trial of said issue February 12, 1880, the said *Breed* proved by said Wakefield and one G. J. Jackson, in effect, that they were present at the time of the trade, and that *Henry Ketchum* purchased the mortgaged premises of Wakefield for $12,500, of which $7,500 was to be paid in pine lands and $5,000 by assuming and agreeing to pay the note and mortgage to *Breed;* and Wakefield testified that he executed and mailed to *Henry Ketchum* a deed of the premises, containing, as he believed, the agreement stated, and that *Ketchum* had admitted to him that he had received the deed. Judgment was thereupon rendered against said *Henry Ketchum*, and in favor of said *Breed*, on said issue.

Upon an affidavit of said *Henry Ketchum*, stating in detail his said efforts, and the efforts of his counsel, to continue said cause, and their failure, and the affidavits used on such applications for continuances, and the records and files in the case, a motion was made by him, at the April term of the court for 1880, to open and set aside said judgment as against *Ketchum*, and grant a new trial therein, which was resisted, and an affidavit presented thereon, sworn to by Ephraim Mariner, to the effect, among other things, that on the afternoon of February 12, 1880, he saw and talked with said Trow at Oshkosh; that Trow then stated to him, in effect, that he and said Jackson were interested with *Ketchum* in the pine-land property; that they were both present when the trade was made in a hotel at Grand Rapids; that Fortune mentioned in *Ketchum's* said affidavit was not there; that the trade was made and closed at that time, with the exception of making a deed; that *Ketchum* then and there, as a part of the bargain, agreed to assume and pay the mortgage debt, substantially as testified to by Wakefield and Jackson; that said Mariner, as attorney for *Breed*, and said *Ketchum*, Wakefield, and Trow, all remained at Oshkosh during all the afternoon of February 12, 1880, but that neither *Ketchum* nor his coun-

sel said anything to said Mariner about opening said cause or examining said Trow or *Ketchum;* that had such request been made he would readily have consented; that Trow and Jackson then resided 100 miles from the place of trial, and Mariner at Milwaukee. Upon the hearing of the motion the same was denied, with costs, April 13, 1880, and an order entered accordingly. On *Ketchum's* appeal from that order, the same was affirmed by this court. 51 Wis. 164.

The bill, which was verified May 15, 1882, further states that since the rendition of said personal judgment against *Ketchum,* and since the order of April 13, 1880, refusing to vacate and set aside the same, the said *Henry Ketchum* had discovered new and important evidence which was not known to him at the time of the rendition of said judgments or the making of said order, to the effect stated in the opinion; that said *Henry Ketchum* did not know until on or about March 14, 1882, that he could prove the facts set forth in the statements of the newly discovered witnesses, Snell, Beatty, and M. M. Ketchum, sworn to by them respectively, March 14, 1882, and accompanying the bill, and that he first learned that they would so testify March 14, 1882; that prior to that date he did not know that any of said persons were present when the trade between him and Wakefield was made, or that any of them heard any conversation between him and Wakefield thereto; that he can prove by said Trow, in effect, as stated in Trow's affidavit and in the opinion of the court; that when he took Trow with him to Oshkosh, February 12, 1880, he did not talk with him in regard to the matter, as he had understood he was one of *Breed's* witnesses, but took him along, relying upon his telling the truth; and he accompanies the bill by Trow's affidavit, sworn to March 14, 1882.

The bill further states, in effect, that *Henry Ketchum* never received a deed or conveyance of the Omro mill from Wakefield, through the post-office or otherwise, and never

so informed Wakefield; that he was never able to procure the testimony of said Fortune, because he was in some remote mining region on the Pacific slope; that the trade between him and Wakefield was wholly made at Merrillan, Wisconsin; that the train was held there for some time to complete the same, and, when so completed, said Wakefield, Jackson, Trow, and *Henry Ketchum* went to Grand Rapids solely for the purpose of making the writings thereto, but that no part of said trade was made on the cars after leaving said Merrillan, or at Grand Rapids. The bill prays, in effect, that the judgment for deficiency against *Henry Ketchum*, and the order denying his application to set aside and vacate the same, be each reviewed and reversed, in consideration of the discovery of new matter as aforesaid. Leave was granted to file the bill April 13, 1882.

For the appellant there was a brief by *G. W. Cate*, and oral argument by *D. J. Pulling.*

*E. Mariner*, for the respondent.

The following opinion was filed January 12, 1886:

CASSODAY, J. All agree that in December, 1876, Wakefield and *Henry Ketchum* met, negotiated, and consummated an agreement to trade or exchange real estate. All agree that the witnesses Jackson and Trow were present when the agreement was consummated and the writings drawn. All agree that by the terms of the agreement *Ketchum* was to let Wakefield have his interest in certain mill property and pine lands at and near Merrillan, and receive in payment therefor Wakefield's interest in the Omro mill property, with the *Breed* mortgage of $5,000 upon it, and for the balance Wakefield's several notes aggregating $13,500.

The controverted question is whether it was agreed that *Ketchum* should assume and pay the *Breed* mortgage, or merely take the property, or the avails of it, subject to the

mortgage. This question does not so much concern *Breed* as it does Wakefield, and possibly Stillman and Horace H. and Martin Rich, for *Breed's* judgment for deficiency is against all of them. The real controversy is whether *Ketchum* or Wakefield is primarily liable for the payment of the mortgage debt. Wakefield and Jackson testified, in effect, that in the trade *Ketchum* was to take the Omro mill property at a valuation of $12,500, less the $5,000 mortgage upon it — that is, at $7,500; and that *Ketchum* agreed to assume and pay that mortgage. The statement in Trow's affidavit agrees with this, in effect, except that he did not hear him *agree to pay* the mortgage, and denies having so told Mariner. Trow states the trade in detail; and in addition said, in effect, that Wakefield took the property he received from *Ketchum* at a valuation of $21,000, and gave him therefor the Omro mill, as stated, at $7,500, and his notes for $13,500. Neither the plaintiff, nor any of his newly discovered witnesses, deny such valuations; but each asserts, in effect, that *Ketchum* did not agree to assume or pay the mortgage; and that Wakefield agreed to give *Ketchum* for the property received of him $13,500 and what could be realized out of a sale of the Omro mill over and above the mortgage upon it; and that Wakefield agreed to sell the mill for *Ketchum*, and claimed he had received an offer for it. The intimation is that Wakefield was to retain the title, and *Ketchum* swore that he never received any deed from him.

If the Omro mill property was of the value of $12,500 in December, 1876, it is a little singular that it did not bring more at sheriff's sale in January, 1879, or why there should be such a large deficiency on the sale. Whether from some cause the property had greatly depreciated in value, or it so happened that there was no competition at the sale, does not appear. Nor is it material, since the valuation is of no importance, except in so far as the valuation put upon it at

the time of the trade may raise an inference for or against the respective claims of the parties. It is to be regretted that the question thus controverted was never in fact fully tried upon both sides in open court. There is a natural feeling on the part of all that whoever claims, in good faith, to have a defense to an alleged cause of action, should have the privilege of establishing it in court if he can. Fair play seems to demand not only an opportunity of having a trial, but a full and fair trial. It is the old maxim that every one is entitled to his day in court. But "his day in court" does not mean any day during a series of years. It simply means *the day* on which the cause is reached for trial in pursuance of the forms and methods prescribed by law. There must necessarily be some end to every litigation. To secure this, there must be more or less stringency in requiring parties to be on hand with their witnesses when the cause is reached for trial in its order.

But it is urged that the failure to be present and ready for trial at the time appointed, and the failure to discover the requisite number of witnesses to insure success at such trial, were excusable by reason of a series of mishaps detailed. The availability of such excuses must necessarily be considered. Upon *Mr. Ketchum's* version of the transaction, several questions are suggested. If the Omro mill property was regarded at the time of the trade of the value stated, or of any substantial value over and above the mortgage, then why would not *Ketchum's* self-interest induce him to exact a conveyance from Wakefield? Wakefield testified that the deed was not made at the time of the writings at Grand Rapids for want of papers showing a description of the land, but that it was executed soon after, and sent by mail to *Ketchum*, and that he thinks it contained a clause making him agree to assume and pay the mortgage; and that *Ketchum* subsequently told him he had received the deed. If *Ketchum* never received it, then it is

a little singular that he never asked for it, nor spoke of it thereafter, nor insisted that Wakefield should sell the land, nor made any inquiry of him respecting the sale of the land. If, at the time of the trade, the Omro mill property was regarded as of the value stated, or any substantial value over and above the mortgage, then what possible objection could *Ketchum* have had at the time to assuming and agreeing to pay the mortgage, since he would necessarily be obliged to do it, or lose all the interest he had in the property? If, at the time of the trade, it was understood that Wakefield should retain the title of the Omro mill, and *Ketchum* never received any deed, and was never in possession of the property, as claimed, then it is very singular how *Breed*, who was not a party to the transaction, came to make him a defendant in the foreclosure suit, and especially his wife. After *Ketchum* was made a defendant in the action of foreclosure, and his demurrer to the complaint therein struck out on the ground of being frivolous, why did he not answer upon the merits the charge of his alleged liability for deficiency prior to the rendition of the judgment of foreclosure and sale, October 29, 1877, or disclaim any title to the land?

No excuse whatever is attempted for such failure to answer such charge of liability upon the merits before such judgment. That judgment fixed his liability for deficiency. The sale was not made until in January, 1879. After the sale and the amount of the deficiency had been ascertained, *Ketchum* moved to set aside and vacate such judgment for deficiency as against him. The court permitted him to answer and have the privilege of a trial thereon, but let the judgment stand. 51 Wis. 165. The issue made by that answer and the complaint in the foreclosure action was tried at Oshkosh, in the absence of *Ketchum*, in the forenoon of February 12, 1880. On that trial the court found against *Ketchum*, and of course refused to open or set aside the

personal judgment for deficiency previously rendered against him and others. Notwithstanding *Ketchum* and his witness Trow reached Oshkosh at 2 P. M. of the same day, yet no effort whatever was made to reopen such issue for retrial, nor to allow *Ketchum* and Trow to be sworn and examined therein. If *Ketchum* wanted a new trial by reason of his failure to get there with Trow in time to participate in the trial, he should have applied for it at once while the plaintiff's attorney and witnesses were still present, and his failure to do so at the time was such a want of diligence as to bar any subsequent application upon the same ground. *Earl of Portsmouth v. Effingham*, 1 Ves. Sr. 435. So far as this bill of review is concerned, therefore, the case must be treated the same as though *Ketchum* and Trow had been sworn and testified on the trial in effect as stated in the bill. *Ibid.* So the failure to continue the cause for the absence of Fortune cannot be considered on this demurrer, as it does not appear that any effort has since been made to ascertain his address or secure his testimony. Nor does it appear that he was present during the trade, nor that he would testify to anything material to the issue, much less that he is a newly discovered witness, or can give any newly discovered evidence. *Ibid.* If the "new matter" or "new proof" is such that it could have been used at the time when the hearing was had or the decree passed, then it is not available upon a bill of review. *Ibid.; Norris v. Le Neve*, 3 Atk. 35; *Patterson v. Slaughter*, 1 Amb. 292; *Young v. Keighly*, 16 Ves. Jr. 348; *Blake v. Foster*, 2 Ball & B. 457.

There is no attempt in the bill to account for *Ketchum's* failure to remember that his son, Snell, and Beatty were present during the negotiations of the trade. If he could not remember all who were there, then why did he fail, prior to March 14, 1882, to make any inquiry of his son, or of Trow and Jackson, whom he knew to have been pres-

ent? Just how he came to discover on that day or about that time that they were all present during the trade, which occurred more than five years previously, does not appear. It will be observed that the transaction in question was wholly between Wakefield and *Ketchum* personally. In the trade between them there was no intervening agency nor middle-men. The alleged agreement in controversy was either made by *Ketchum* personally with Wakefield or not at all. Whether it was made or not was necessarily known to *Ketchum* at the time of the trade, in December, 1876. Being known to him at the time, it could not possibly be discovered by him thereafter. There is ,no claim that the exact terms of the trade were ever forgotten by *Ketchum.* In his answer, made in January, 1879, he denied having made the alleged agreement. He necessarily knew the only fact which he desired to prove during the whole pendency of the foreclosure action, and subsequently, when he put in his answer, and when the issue thereon was tried and decided against him, and ever since.

Assuming *Ketchum's* version of the transaction to be correct, then he knew during all that time that he could disprove such alleged agreement by himself, and also by Trow, Jackson, and Wakefield, if they would tell the truth. The claim is that he "did not know until on or about" March 14, 1882, that he could also disprove the alleged agreement by his son, Snell, and Beatty; that he then first learned they would so testify; that prior to that time he did not know that either of them were present when the trade was made, or heard any of the conversation. If this is true, and they were in fact present, then *Ketchum* must have known it at the time, and forgotten it thereafter, although he says nothing about having forgotten the fact of their presence, but simply insists that he never knew it. The only discovery which *Ketchum* could make March 14, 1882, was either that the three persons named were present at the time of

making the trade in such a way or so concealed as to be unknown to him at the time, or else that he knew it at the time, and had forgotten it until afterwards, when reminded of it. In other words, the claim is, not that he discovered or was reminded of any new fact, March 14, 1882, but that he then discovered or was reminded of three additional witnesses, who would each testify to a fact well known to himself all the time, and which, during all the time, would have been testified to by himself and three other persons whom he knew to have been present when the trade was made, if they would have told the truth.

Is the claim such as to require a court of equity, under all the facts and circumstances disclosed, to entertain this bill of review, especially after so long delay and so many laches? Almost every thorough discussion of the question goes back to and substantially follows the first of the celebrated 101 ordinances in chancery made by the great philosophical Lord Chancellor. 2 Works Ld. Bac. 479. See, also, Story, Eq. Pl. § 404; 2 Barb. Ch. Pr. 91; *Brewer v. Bowman*, 20 Am. Dec. 160. That declared, in effect, that "no bill of review shall be admitted, except it contain either error of law . . . or some *new matter* which hath arisen in time after the decree, and *not any new proof* which might have been used when the decree was made. *Nevertheless, upon new proof* that *is come to light after* the decree made *and could not possibly* have been used at the time when the decree passed, a bill of review may be grounded by the special license of the court, and not otherwise." Here the bill was filed by special license of the court. There is no claim of any error of law upon the face of the record. It cannot seriously be claimed that any "new matter" had risen or been discovered prior to the filing of the bill and since the decree in the foreclosure suit fixing the liability of *Ketchum*. There certainly was nothing more than the discovery or remembrance of some "new proof" or evidence

of a fact well known to *Ketchum* from the first, and "which might have been used when the decree was made," had *Ketchum*, prior to that time, put in his answer and remembered the fact of the presence of the three witnesses named when the transaction occurred. To authorize this bill of review, within the meaning of the last clause of the portion of the ordinance quoted, it was requisite that it should appear therein that "new proof" had "come to light after the decree" was made which "could not possibly have been used at the time when the decree passed."

Has the plaintiff brought his case within this rule? The proposed new evidence was relevant to the issue made. In some of the very early cases it was held, in effect, that a bill of review could never be maintained upon "new proof" of a matter of fact particularly put in issue before the former hearing. *Chambers v. Greenhill*, 2 Rep. in Ch. 66; *Anonymous*, 1 Freem. Ch. 31, case 35. But subsequently it was held by Lord Chancellor TALBOT, in effect, that a bill of review might be maintained "upon *some* matter, as a *release, receipt*, etc., proved to have been discovered since" the decree. *Taylor v. Sharp*, 3 P. Wms. 371. This was put upon the ground that "unless this relief were *confined to such new matter*, it might be made use of as a method for a vexatious person to be oppressive to the other side, and for the cause never to be at rest." *Ibid.* The rule that a bill of review may be grounded upon "new proof" consisting of documentary evidence which was discovered after the decree, was afterwards sanctioned by numerous decisions in England and this country. *Standish v. Radley*, 2 Atk. Ch. 177; *Earl of Portsmouth v. Effingham*, 1 Ves. Sr. 430; *Att'y Gen. v. Turner*, 2 Amb. 587; *Massie's Heirs v. Graham's Adm'rs*, 3 McLean, 46; *Bradshaw v. Garrett*, 1 Porter, 54; *Ex parte Vandersmissen*, 5 Rich. Eq. 519; *S. C.* 60 Am. Dec. 102. Such testimony is not merely cumulative, but may be regarded as new evidence of an independent

fact, although bearing directly upon the former issue. *Wilson v. Plank*, 41 Wis. 94. But even the discovery of such documentary evidence has been held insufficient whenever there has been any want of diligence, or the · allowance of the bill might work injustice, or the new evidence would be ineffectual. *Norris v. Le Neve*, 3 Atk. 26; *Wilson v. Webb*, 2 Cox, Ch. 3; *Blake v. Foster*, 2 Ball & B. 457; *Massie's Heirs v. Graham's Adm'rs, supra; Bradshaw v. Garrett, supra; Jones v. Pilcher's Devisees*, 6 Munf. 425. Even the loss or mislaying of such documentary evidence has been held insufficient ground upon which to maintain a bill of review. *Jones v. Pilcher's Devisees, supra.*

The liberal rule as to granting bills of review, on the ground of newly discovered documentary evidence, does not extend to newly discovered testimony resting wholly in parol. *Chambers v. Greenhill, supra; Young v. Keighly*, 16 Ves. Jr. 348; *Livingston v. Hubbs*, 3 Johns. Ch. 124; *Taylor v. Sharp, supra; Dexter v. Arnold*, 5 Mason, 303; *Jenkins v. Eldredge*, 3 Story, 310 *et seq.; Southard v. Russell*, 16 How. 569, 570. Where the newly discovered evidence would have been relevant and material to the former issue, and rests wholly in and is dependent entirely upon the memory of witnesses living ·at the time of the hearing, and whose testimony might then have been obtained had their knowledge of the facts been then known to the · parties, it will not be available upon bill of review where, as here, it is merely in contradiction or impeachment of evidence that was given, or merely cumulative to evidence which was, or with ordinary diligence might have been, given upon such hearing. *Chambers v. Greenhill, supra; Taylor v. Sharp, supra; Young v. Keighly, supra; Norris · v. Le Neve, supra; Livingston v. Hubbs, supra; Jenkins v. Eldredge, supra; Respass v. McClanahan*, Hardin, 342; *Brewer v. Bowman*, 3 J. J. Marsh. 492; *S. C.* 20 Am. Dec. 158; *Vaughn v. Hann*, 6 B. Mon. 338; *Tharp v. Cot-*

*ton's Ex'rs,* 7 B. Mon. 636; *Southard v. Russell, supra; Bradshaw v. Garrett, supra; Caller v. Shields,* 2 Stew. & P. 417; *Love v. Blewit,* 1 Dev. & B. Eq. 108; *Warren v. Hope,* 6 Greenl. 479; *Iler v. Routh's Heirs,* 3 How. (Miss.) 293; *Foy v. Foy,* 25 Miss. 212; *Randolph's Ex'r v. Randolph's Ex'rs,* 1 Hen. & M. 180; *Stevens v. Hey,* 15 Ohio, 313. Besides, it is a rule universally recognized that " new proof," to be available on bill of review, must be such as could not have been discovered before the hearing by the exercise of reasonable diligence. *Young v. Keighly, supra; Norris v. Le Neve, supra; Livingston v. Hubbs, supra; Blake v. Foster, supra; Dexter v. Arnold,* 5 Mason, 312; *Respass v. McClanahan, supra; Caller v. Shields, supra; Iler v. Routh's Heirs, supra; Stevens v. Hey, supra; Jenkins v. Prewitt,* 7 Blackf. 329; *Barnes v. Dewey,* 58 Ind. 418; *Green's Appeal,* 59 Pa. St. 235; *Simpson v. Watts,* 6 Rich. Eq. 364; *S. C.* 62 Am. Dec. 392; *Brainard v. Morse,* 47 Vt. 320; *Todd v. Chipman,* 62 Me. 189. "The question always is," said Lord ELDON, " not what the plaintiff knew, but what, using reasonable diligence, he might have known." 16 Ves. Jr. 353. This language has been frequently sanctioned by eminent judges. 2 Ball. & B. 461; 3 Story, 315. And this rule, according to Lord HARDWICKE, applies, not only to the party, but also to his attorneys, solicitors, and agents. *Norris v. Le Neve,* 3 Atk. 35; *Gould v. Tancred,* 2 Atk. 533.

The want of recollection as to all who were present during the trade, when it degenerated into a want of reasonable diligence in refreshing the memory respecting the same, was such as to justify the court in refusing a review. The facts alleged in the bill fail to bring the case within the rules established in chancery. Besides, the granting of relief by bill of review is not a matter of strict right, but rests in the sound discretion of the court. *Wilson v. Webb, supra; Green's Appeal, supra: Dexter v. Arnold,* 5 Mason, 315. We certainly cannot say, upon the case made in the

bill, that there was any abuse of discretion. We have not taken into account the attempt to retry the cause on motion (51 Wis. 164), nor afterwards by original bill in equity to restrain the collection of the judgment. *Ketchum v. Breed*, 54 Wis. 131. The view we have taken of the case renders it unnecessary to determine whether the old remedy by bill of review has been superseded and wholly abrogated by sec. 2832, R. S., as urged by counsel, or not; or whether there is any defect of parties. Cases may well be conceived where it would be the only possible remedy.

*By the Court.*— The order of the circuit court is affirmed.

Upon a motion for a rehearing there was a brief for the appellant, signed by *G. W. Cate*, attorney, and *E. P. Smith* and *M. B. Patchin*, of counsel, and a brief for the respondent by *E. Mariner*.

The motion was denied May 15, 1886.